1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GLENDA BROWN, | ) | 1:10cv01280 LJO DLB |
| | ) | |
| | ) | FINDINGS AND RECOMMENDATION |
| Plaintiff, | ) | REGARDING PLAINTIFF'S |
| | ) | SOCIAL SECURITY COMPLAINT |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## BACKGROUND

Plaintiff Glenda Brown ("Plaintiff") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her applications for disability

insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social

Security Act.  The matter is currently before the Court on the parties' briefs, which were

submitted, without oral argument, to the Magistrate Judge for Findings and Recommendations to

the District Court.

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff filed her applications on June 30, 2005, alleging disability since June 16, 2003,

due to a back and neck injury and arm and leg pain.  AR 76-78, 174-181.  After her applications

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page
number.

1    were denied initially and on reconsideration, Plaintiff requested a hearing before an

2    Administrative Law Judge ("ALJ").  AR 41, 42, 43, 498, 499, 504.  ALJ Michael J. Haubner held

3    a hearing on July 12, 2007, and issued a decision denying benefits on August 24, 2007.  AR 15-

4    24, 509-552.  The Appeals Council denied review on May 14, 2010.  AR 6-9.

5        Hearing Testimony

6        ALJ Haubner held a hearing on July 12, 2007, in Fresno, California.  Plaintiff appeared

7    with her attorney, Charles Oren.  Vocational expert ("VE") Judith Najarian also appeared and

8    testified.  AR 509.

9        Plaintiff testified that she was born in 1950 and completed the twelfth grade.  AR 517-

10   518.  She alleges that she became disabled on June 16, 2003, the day she last worked, but she

11   also looked for work in January 2004.  Plaintiff last worked for seven months in 2003 as an in-

12   home care aide.  AR 518.  She also worked for three months in 2001as an in-home care aide and

13   nine months in 1998 at a recycling center.  Plaintiff also worked as an in-home care aide in 1996

14   and 1993.  AR 519.

15       Plaintiff lives with her son, who is 37, and her three grandchildren, ages 17, 15 and 8.

16   Plaintiff is home alone with her grandchildren about 10 hours a day while her son works.  AR

17   520.  She does not have a driver's license and does not drive.  Plaintiff gets a ride or uses the bus

18   to get around.  She is able to care for her personal needs and prepares simple meals about once a

19   day.  AR 521.  She does dishes once a day and last did laundry three years ago.  Plaintiff does not

20   go shopping for groceries.  AR 522.  Plaintiff talks on the phone twice a day and visits with

21   people outside of her home once a day.  She does not dust furniture, take out the trash, sweep or

22   vacuum, but cleans the kitchen once a day.  AR 523-524.  Plaintiff watches television about two

23   hours a day.  AR 524-525.

24       Plaintiff testified that she has constant pain in her back and rated it as a 7 out of 10.  AR

25   525-526.  She also has constant pain in her left leg and rated it as a seven.  Plaintiff takes

26   medicine to relieve the pain.  AR 526.  Plaintiff testified that she is fully compliant with her

27   treatment.  She continues to smoke cigarettes though doctors told her to quit in 2001.  AR 526.

28   Plaintiff weighs 212 pounds and doctors have told her to lose weight.  She follows her weight

2

loss diet 100 percent and has lost eight pounds in the last year.  Plaintiff was also told to exercise, but she does not do so.  AR 527.  Plaintiff does not wear glasses all the time and has never seen an eye doctor for glasses, although she has problems seeing.  She wears glasses from the drug store to read.  AR 527-528.

Plaintiff walks across the street twice a week.  She thought that she could walk a half block before needing to rest and stand for 20 minutes.  Plaintiff thought that she could sit for 20 to 25 minutes at a time and could pick up about 15 pounds.  AR 529-530.  Plaintiff also has difficulty concentrating because of pain and thought that she could focus for 15 minutes at a time.  She has to lay down three times during the day, for an hour each time, because of pain.  AR 530.  During an eight hour period, Plaintiff thought she would have to lay down for two hours.  AR 531.

When questioned by her attorney, Plaintiff explained that for the past year, she has had problems with her hands cramping up when she does anything.  Her hands stay cramped for about an hour before eventually loosening up.  She estimated that her hands cramp for a total of three hours during the day and explained that the cramping is worse as she uses her hands more.  AR 546-547.  The cramping causes her to drop things daily.  AR 550.  She thought that she could grip or grasp something for about two minutes before needing to rest both hands for about 10 minutes.  AR 550-551.  Plaintiff has told her doctors about the cramping about five times.  AR 548.

Plaintiff also has a problem with pain in her right knee and it hurts when she walks or steps up.  AR 549.

Plaintiff takes Zyprexa, which makes her feel suicidal and more depressed.  She has been referred to mental health specialist and has an upcoming appointment.  AR 548.

For the first hypothetical, the ALJ asked the VE to assume a person of Plaintiff's age, education and experience.  This person could sit for one hour at a time, walk for one block at a time and up to three hours total, and stand for 25 minutes at a time and up to three hours total.  This person could occasionally bend, squat, climb and twist and could never kneel or crawl.  This person can constantly manipulate and reach and can occasionally lift/carry 11 to 25 pounds.  The

3

VE testified that this person could not perform Plaintiff's past relevant work but could perform some light, unskilled work.  For example, this person could perform the positions of cashier, counter clerk and sales attendant.  AR 536-537.

For the second hypothetical, the ALJ asked the VE to assume a person who could not lift more than 20 pounds for a third of the day.  The VE testified that this person could not perform Plaintiff's past work but could perform the positions of cashier, counter clerk and sales attendant.  AR 537.

For the third hypothetical, the ALJ asked the VE to assume a person who could lift and carry 20 pounds occasionally, 10 pounds frequently, and frequently climb ramps and stairs.  This person could never climb ladders, ropes or scaffolds.  This person could occasionally stoop and crouch but had to avoid repetitive bending, stooping and twisting.  This person could not perform Plaintiff's past work but could perform the positions of cashier, counter clerk and sales attendant.  AR 537-538.

For the fourth hypothetical, the ALJ asked the VE to assume a person who needed to avoid bending, and lifting, pushing or pulling more than 25 pounds.  This person could not perform Plaintiff's past relevant work but could perform sedentary, unskilled work.  AR 538.

For the fifth hypothetical, the ALJ asked the VE to assume a person who could lift 50 pounds occasionally, 25 pounds frequently, sit/stand/walk for six hours a day and infrequently squat, kneel and climb stairs.  This person could not use the left, nondominant upper extremity above shoulder level and could not lift above shoulder level.  This person could not perform repetitive motions above shoulder level with the left upper extremity and could not perform any heavy lifting or strenuous pushing or pulling with the left hand.  This person could not perform Plaintiff's past relevant work but could perform medium, unskilled work.  For example, this person could perform the positions of grocery bagger, conveyor off-bearer and floor attendant.  AR 539-541.

For the sixth hypothetical, the ALJ asked the VE to assume a person who could lift and carry 50 pounds occasionally, 25 pounds frequently and stand and walk for six hours each.  This person can sit without restriction but could not perform frequent bending, stooping, crouching or

1  squatting.  This person also had slight visual limitations, but could avoid hazards and distinguish
2  smaller objects at arms length.  The VE testified that this person could not perform Plaintiff's
3  past work but could perform the medium positions of grocery bagger, conveyor off-bearer and
4  floor attendant.  AR 542-543.

5       For the seventh hypothetical, the ALJ asked the VE to assume a person who could
6  perform full-time medium work.  The VE testified that this person could not perform Plaintiff's
7  past work but could perform medium positions of grocery bagger, conveyor off-bearer and floor
8  attendant.  AR 544.

9       For the eighth hypothetical, the ALJ asked the VE to assume a person who lost 50 percent
10 of pre-injury capacity for bending, stooping, lifting, pushing, pulling, climbing and other
11 activities involving comparable physical effort.  This person could not perform prolonged
12 stationary positioning, sitting, standing or walking.  The VE could not perform Plaintiff's past
13 work but could perform sedentary, unskilled work.  AR 544-545.

14      For the ninth hypothetical, the ALJ asked the VE to assume a person who could lift and
15 carry 15 pounds, walk half a block at a time, stand for 20 minutes at a time and concentrate in 15
16 minute increments.  This person would need to take two one-hour unscheduled breaks.  The VE
17 testified that this person could not perform any work.  AR 545-546.

18      If this person could not grip or grasp for more than two minutes at a time before needing
19 to rest her hands for ten minutes, it would preclude work under all hypotheticals.  AR 551.

20      Medical Record
21      *Medical Evidence Prior to Alleged June 2003 Onset Date*

22      Plaintiff sustained a work-related back injury on March 6, 1998.  She treated at Concentra
23 Medical Centers through June 30, 1998.  During that time, Plaintiff was treated with medication
24 and physical therapy and was released for modified work.  As of June 30, 1998, Plaintiff could
25 not lift, carry, pull or push more than ten pounds and could not perform repetitive bending at the
26 waist.  AR 235-252.

27      On July 21, 1998, Plaintiff began seeing Robert Mochizuki, M.D.  He noted that x-rays
28 revealed mild degenerative changes with narrowing of the L5-S1 disc space.  On examination,

1    Plaintiff had palpable tenderness over the lower back and right sciatic notch area.  Straight leg

2    raising on the right was minimally uncomfortable but full.  He diagnosed lumbosacral strain with

3    degenerative disc disease at L5-S1 with possible sciatica of the right lower extremity.  He

4    ordered an MRI and precluded Plaintiff from repetitive bending, stooping, carrying and lifting in

5    excess of 20 pounds repetitively.  AR 230-232.

6        An August 24, 1998, MRI of Plaintiff's lumbar spine revealed a small disc bulge at L5-

7    S1.  AR 228-229.

8        Plaintiff returned to Dr. Mochizuki on August 27, 1998, and complained of pain in her

9    back and left thigh.  Treatment notes indicate that Plaintiff had not resumed working and was

10   laid off from work.  Plaintiff had limited truncal flexion and palpable tenderness over the lower

11   back and left sciatic notch.  Dr. Mochizuki diagnosed lumbar strain and recommended physical

12   therapy and continuation of Flexeril, Dayro and Tylenol with codeine.  Plaintiff was precluded

13   from repetitive bending, stooping, carrying and lifting more than 20 pounds repetitively.  AR

14   226.

15       Plaintiff saw Dr. Mochizuki again on September 10, 1998, and reported improvement in

16   her back pain.  There was palpable tenderness over the lower lumbar spine.  Straight leg raising

17   was negative and her neurological examination was normal.  Dr. Mochizuki diagnosed a

18   lumbosacral strain and degenerative disc disease at L5-S1.  He recommended that Plaintiff

19   resume her customary and usual work activities.  AR 223.

20       Plaintiff began treating with P. James Nugent, M.D., in November 1998.  AR 254-293.

21   He declared Plaintiff permanent and stationary in March 1999.  Plaintiff would be precluded

22   from repetitive bending and no lifting, pushing or pulling more than 25 pounds.  AR 280.  He

23   also opined that Plaintiff could sit for three to six hours, for one hour at a time, walk for up to

24   three hours, one block at a time, and stand for up to three hours, for 25 minutes at a time.  She

25   could never kneel or crawl and could occasionally twist at the waist.  Plaintiff could occasionally

26   lift up to 25 pounds.  AR 282-232.

27       Dr. Nugent's notes from May 21, 1999, indicate that Plaintiff was to begin vocational

28   training in June.  AR 260.

When Plaintiff returned to Dr. Nugent in July 1999, she complained of increasing discomfort to her right lower lumbar area. On examination, Plaintiff's gait was slightly angulated to the right and range of motion was limited. She had generalized tenderness to the lumbar spine area and sensation was slightly decreased to the L3 dermatome at the anterior thigh. He diagnosed lumbar pain, degenerative disc disease of the lumbar spine, spinal stenosis of the lumbar spine and a herniated disc in the lumbar spine. Plaintiff was taking Daypro as ordered and was taking Soma on a less frequent basis. She received a month's refill for Vicodin and Dr. Nugent noted that she should not receive further medication without examination. AR 254-255.

On September 16, 1999, Plaintiff saw Jacqueline Frainie, M.D., for a consultive physical examination. She complained of sharp low back pain that radiated from side to side and down her right leg. On examination, there was tenderness to palpation over the lumbar spine bilaterally, with no muscle spasm or increased tone. Range of motion of the back was decreased but range of motion of the extremities was within normal limits. Pulses were normal and Plaintiff had good tone bilaterally. Hand grip was normal. Strength was 4/5 in the lower extremities bilaterally and 5/5 in the upper extremities. Sensory was equal throughout and reflexes were normal. Plaintiff had an antalgic gait. Dr. Frainie diagnosed back pain and noted that Plaintiff did have decreased muscle strength in her bilateral lower extremities. She believed that Plaintiff should be precluded from lifting more than 20 pounds for more than a third of the workday. AR 294-298.

Also on September 16, 1999, Mathew L. Nickels, M.D., reviewed x-rays of Plaintiff's lumbar spine. The x-rays showed moderate dextroscoliosis, osteoarthritis and vascular calcification. AR 299.

On December 1, 1999, State Agency physician Michael F. Escobar, M.D., completed a Physical Residual Functional Capacity Assessment form. He opined that Plaintiff could occasionally lift 20 pounds, ten pounds frequently, stand and/or walk for about six hours and sit for about six hours. Plaintiff could frequently climb ramps and stairs but could never climb ladders, ropes or scaffolds. She could frequently balance, kneel and crawl and occasionally stoop and crouch. Plaintiff had to avoid repetitive bending, stooping and twisting. AR 300-309.

Plaintiff returned to Dr. Nugent on April 20, 2000, and complained of severe to moderate constant pain in her lumbar spine, as well as numbness and tingling in her legs.  Plaintiff was currently employed and temporarily partially disabled.  Range of motion was reduced and straight leg raising was positive on the right.  Plaintiff had decreased sensation in the right leg and foot and decreased motor strength in the left hip, knee, ankle and toe.  Plaintiff was ordered to continue with Daypro for inflammation, Soma for muscle spasms and Vicodin for pain.  He also recommended that Plaintiff attend six weeks of physical therapy and she was provided with a lumbar corset.  The restriction to no bending, lifting, pushing or pulling more than 25 pounds remained.  AR 311-314.

On September 14, 2000, State Agency physician James Peery, M.D., completed a Physical Residual Functional Capacity Assessment form.  Dr. Peery opined that Plaintiff could occasionally lift 20 pounds, ten pounds frequently, stand and/or walk for about six hours and sit for about six hours.  Plaintiff could occasionally climb ramps and stairs but could never climb ladders, ropes or scaffolds.  She could frequently balance, kneel and crawl and occasionally stoop and crouch.  AR 340-347.

On June 18, 2002, Plaintiff saw Troy Smith, M.D., for an orthopedic consultive examination.  Plaintiff complained of pain on the left side of her body, including neck and arm pain and numbness of the left hand.  She also complained of difficulty grasping with the left hand.  On examination, Plaintiff was in no acute distress and got on and off the examination table without difficulty.  She walked without a limp and could stand on her toes and heels without difficulty.  Range of motion of the lumbar spine was reduced and she had moderate tenderness of the left sciatic notch area and left sacroiliac joint.  Straight leg raising was to 80 degrees without difficulty.  Range of motion of the left shoulder was decreased and she had moderate tenderness over the anterior acromial area of the left shoulder.  Plaintiff had pain with flexion and abduction of the left shoulder and resisted any further flexion or abduction.  There was mild crepitation with rotation of the left shoulder.  Grip strength was 5/5 bilaterally and motor strength was normal.  Sensation was normal to pinprick and light touch throughout.  AR 350-353.

Dr. Smith diagnosed neck pain with left radiculitis of unknown etiology, possible early impingement syndrome of the left shoulder and low back pain with left radiculitis due to unknown etiology.  Plaintiff could not perform work requiring heavy lifting or repeated bending. She could lift 50 pounds occasionally and 25 pounds frequently.  Plaintiff could sit, stand and walk for six hours.  She could infrequently kneel, squat and climb stairs and could not use her left arm above shoulder level.  She could not lift above shoulder level and could not perform repetitive motions above the left shoulder level.  Plaintiff could not perform heavy lifting or strenuous pushing or pulling with the left hand.  AR 354.

On July 15, 2002, State Agency physician Carmen E. Lopez, M.D., completed a Physical Residual Functional Capacity Assessment form.  Dr. Lopez opined that Plaintiff could occasionally lift 50 pounds, 25 pounds frequently, stand and/or walk for about six hours and sit for about six hours.  Plaintiff could perform frequent pushing or pulling with the left upper extremity.  Plaintiff could occasionally climb, kneel, crouch and crawl and could frequently balance and stoop.  Plaintiff had to avoid frequent reaching above shoulder level with the left upper extremity.  AR 356-365.

*Medical Evidence Subsequent to June 2003 Onset Date*

In June 2003, Plaintiff sustained a work-related back injury while working as an in-home care provider.  She was lifting a patient from the bed to the wheelchair when she hurt her lower back.  AR 426-433.

X-rays of Plaintiff's lumbar spine were taken on September 8, 2003.  The x-rays revealed mild multilevel degenerative changes, with no evidence of acute fracture or dislocation.  There was also a disc space narrowing and a vacuum disc at L5-S1.  AR 414.

Plaintiff also underwent an MRI of her lumbar spine on September 8, 2003.  The test revealed (1) mild multilevel degenerative changes, (2) mild spinal stenosis at L4-L5 with what appears to be a subtle left foraminal disc bulge, slightly narrowing the left neural foramen, and (3) a small central subligamentous central disc bulge at the L5-S1 level measuring approximately 3 mm and what appears to be a small annular tear.  AR 415-416.

1       On September 9, 2003, Mark Lungren, D.C., performed a Quantitative Functional

2 Capacity Evaluation.  Plaintiff rated her pain as moderate to severe and lumbar spine range of

3 motion was decreased.  Straight leg raising was positive.  Numerous tests relating to Plaintiff's

4 veracity did not raise the specter of symptom magnification.  AR 404-409.

5       On September 16, 2003, Plaintiff underwent a lower extremity nerve study performed by

6 Ronald A. Cyrulnik, M.D.  The findings were consistent with compromise of the nerve root at

7 L4, 5, left side, and the nerve root at S1, bilaterally.  AR 402.

8       Plaintiff returned to Dr. Lungren on October 9, 2003, and he ordered her to remain off

9 work until November 23, 2003.  AR 401.

10       Plaintiff saw Mary Jo Ford, M.D., on October 22, 2003, for an initial pain management

11 consultation.  She complained of constant low back pain with radiation to the left lower

12 extremity, as well as numbness and tingling in the left lower extremity.  Plaintiff also complained

13 of depression, forgetfulness, nervousness, decreased libido, anxiety, nausea, decrease in appetite,

14 frequent headaches and frequent sleep disruption.  On examination, she was in no acute distress.

15 Straight leg raising in the sitting position caused low back pain on the left at 45 degrees.  There

16 was also midline and bilateral tenderness.  Lumbar range of motion was limited and painful.

17 Plaintiff's neurologic examination was normal with no atrophy noted.  Dr. Ford assessed lumbar

18 strain and sprain, left lumbosacral radiculopathy, lumbar disc bulges at L4-5 and L5-S1 with an

19 annular tear at the L5-S1 level and extensive lumbar facet arthropathy.  She recommended a

20 series of lumbar epidural injections and suggested that Plaintiff continue with her physical

21 therapy and chiropractic treatment.  She also ordered an interferential unit, a moisturizing heating

22 pad, cold unit and cervical pillow.  Plaintiff agreed to proceed and schedule an appointment.  AR

23 394-397.

24       On November 4, 2003, Gary Hatcher, D.O., discharged Plaintiff from his care.  He

25 explained that he first saw Plaintiff in July 2003.  On August 6, 2003, he advised her to decrease

26 her use of Vicodin and explained that the drug would be discontinued in the future because her

27 injury was two months old and clinically did not warrant continued use.  When he saw her again

28 on August 22, 2003, her attention was focused on demands for Vicodin.  He refused to continue

the Vicodin.  Plaintiff did not cooperate during the examination and "made it clear she was here for her medication and was interested in nothing else."  She was animated in the examination room during the dispute and did not show discomfort or guarding of the low back.  She stood up briskly and easily from the chair and left the clinic angrily but clearly in no observable discomfort.  Dr. Hatcher discharged Plaintiff to regular work and opined that there was no ratable disability.  AR 392-393.

On February 17, 2004, Plaintiff saw Mohinder Nijjar, M.D., for a Qualified Medical Examination.  She complained of constant slight to moderate pain in her lumbar spine with intermittent radiation to the left lower extremity.  She also complained of constant numbness in the left lower extremity and difficulty bending.  Physical examination of the lumbar spine showed straightening of the normal curvature with tenderness noted from L3 to S1.  There was also tenderness over the sacrospinous ligaments, bilaterally, more on the left than the right.  Range of motion was limited.  Plaintiff could stand on her toes but had difficulty walking on her heels and performing a squat.  The neurologic examination of her lower extremities was normal.  AR 382-387.

Dr. Nijjar reviewed Plaintiff's records, including an EMG study suggesting a compromise of the nerve root at L4-5, though "in neurologic studies this means nothing" and "is basically useless."  He also noted Plaintiff's problems with Dr. Hatcher, who indicated that Plaintiff had no problems and refused her demands for narcotic pain medication.  Plaintiff was currently seeing Dr. Blair, who had kept her off work.  AR 382-383.

Dr. Nijjar diagnosed lumbar disc protrusion with lumbar strain and radiculopathy as a result of the June 2003 work injury.  He believed that Plaintiff was permanent and stationary.  She needed to avoid heavy work and had lost 50 percent of her pre-injury capacity for bending, stooping, lifting, pushing, pulling, climbing and other activities involving comparable physical effort.  Plaintiff could not perform prolonged stationary positioning, sitting, standing or walking.

On September 2, 2004, Plaintiff saw Alice Martinson, M.D., for an Agreed Medical Evaluation.  She complained of constant low back pain as well as pain in her legs if she walks for more than a block.  Plaintiff was not taking any medication.  On examination, Plaintiff walked

1   with a normal gait and displayed a moderate amount of pain behavior characterized by groaning,

2   grimacing and sighing.  Plaintiff voluntarily limited range of motion of the lumbar spine due to

3   the possibility of additional pain.  There was no palpable spasm during these maneuvers and

4   Plaintiff was observed to have considerably more spinal flexibility while dressing and undressing

5   in the examination room.  Seated root test was negative bilaterally and straight leg raising was

6   limited to 50 degrees due to hamstring tightness.  Sensory, motor and deep tendon reflex were

7   normal.  FABER test was positive bilaterally.  Plaintiff was tender to even minimal digital

8   pressure in the sciatic notches and over the course of the sciatic nerves in the buttocks or thighs.

9   AR 370-374.

10      Dr. Martinson reviewed the September 8, 2003, x-rays, which showed mild narrowing of

11  the disc spacing at L4-S1 with mild facet arthritis at that level, and an August 1998 MRI.  She

12  diagnosed chronic multilevel degenerative disc disease in the lumbar spine without evidence of

13  radiculopathy.  In reviewing her records, she noted that Plaintiff has filed numerous claims for

14  back pain in the past.  There have never been documented, unequivocal signs of neurologic

15  abnormality and the description of her changes on imaging findings have been remarkably

16  consistent.  Her records also demonstrate very poor participation in physical therapy for all

17  claims and on at least one occasion, a treating source terminated a relationship because of drug-

18  seeking behavior and poor cooperation.  AR 374-375.

19      Dr. Martinson concluded that her most recent injury produced an exacerbation of her

20  underlying degenerative disc disease.  Plaintiff was fit for full time employment but could not

21  perform heavy work.  AR 375.

22      Plaintiff was seen at University Medical Center on September 2, 2005, for complaints of

23  back pain, right leg numbness and neck stiffness.  After examination, she was cleared for full

24  time work, light work only.  Plaintiff could not perform repetitive bending or lifting, could not

25  lift more than 20 pounds and could not stand/walk more than 15 minutes per hour.  AR 497.

26      On September 9, 2005, Plaintiff saw Rustom F. Damania for a consultive physical

27  examination.  Plaintiff complained of daily low back pain since June 2003.  The pain fluctuated

28  in intensity and may radiate to the right leg.  Plaintiff was taking a few Advil a day for pain.  On

1   examination, Plaintiff was in no acute distress or discomfort and had no difficulty getting on and

2   off the examination table.   There was slight tenderness on percussion of the lumbar spine, with

3   no spasms or deformities.   Straight leg raising tests were normal and there was no motor or

4   sensory deficiency.   Gait was normal and Plaintiff could walk on her toes and heels.   Plaintiff had

5   difficulty with a partial squat and required assistance.   Power was 5/5 in both upper and lower

6   extremities.   AR 444-447.

7        Dr. Damania diagnosed uncontrolled hypertension, visual impairment in both eyes,

8   etiology undetermined, and chronic low back pain with no radiculopathy, most likely

9   degenerative joint disease.   Based on a review of the September 2003 x-ray and August 1998

10  MRI, as well as his examination, Dr. Damania opined that Plaintiff should be able to lift 50

11  pounds occasionally and 25 frequently, stand and walk for six hours and sit without restriction.

12  "No postural limitations unless she must do frequent bending, stooping, crouching or squatting."

13  AR 446-447.

14       On December 8, 2005, Plaintiff was seen at University Medical Center for complaints of

15  back pain and high blood pressure.   Plaintiff was poorly compliant with her medications and last

16  took them one year ago.   Plaintiff had no edema in her extremities and pulses were normal.   She

17  had pain on palpation of her lower back and straight leg raising was negative.   Motor strength

18  was 5/5.   Plaintiff was diagnosed with chronic low back pain that seemed musculoskeletal in

19  nature and was prescribed Tylenol.   AR 496.

20       A State Agency physician completed a Physical Residual Functional Capacity

21  Assessment form on January 12, 2006.   The doctor opined that Plaintiff could occasionally lift 50

22  pounds, 25 pounds frequently, stand and/or walk for about six hours and sit for about six hours.

23  Plaintiff could occasionally climb and stoop and could frequently balance, kneel, crouch and

24  crawl.   Plaintiff had to avoid frequent reaching above shoulder level with the left upper

25  extremity.   AR 451-458.

26       On March 28, 2006, State Agency physician Brian Ginsburg, M.D., determined that

27  Plaintiff retained the residual functional capacity for heavy work.   AR 472-473.

28

1    Plaintiff was seen at University Medical Center on February 2, 2007, for hand pain.  She

2  indicated that was having problems dropping things with both hands for the past six months.

3  Muscle strength was 4-5/5 in the right upper extremity.  She was diagnosed with uncontrolled

4  high blood pressure and hand pain, tendinitis vs. ulnar nerve entrapment, rule out nerve

5  impingement.  AR 490.

6    On May 16, 2006, Plaintiff was seen at University Medical Center for complaints of

7  worsening low back pain and depression.  She was diagnosed with low back pain and given

8  Vicodin.  Plaintiff was also started on an antidepressant.  AR 495.

9    Plaintiff was seen in the emergency room for neck and lower back pain on May 9, 2007.

10  AR 484.  On examination, Plaintiff had painless range of motion in her back though she

11  grimaced when getting up.  She was diagnosed with chronic low back pain and given a

12  prescription for Motrin 600mg.  AR 489.

13    Plaintiff returned to the emergency room for back and neck pain on June 4, 2007, a day

14  after running out of Vicodin.  She also complained of headaches and depression and indicated

15  that killing herself has "crossed her mind."  AR 481.  On examination, Plaintiff was in no acute

16  distress, with limited range of motion in her neck, back and right knee.  She also had muscle

17  spasms in her back and a depressed affect.  Plaintiff was diagnosed with chronic back pain and

18  given a prescription for Vicodin.  AR 482.

19    On July 20, 2007, Plaintiff was seen at Community Medical Center for complaints of

20  hand and right knee pain.  Plaintiff was in no acute distress.  There was no edema in her

21  extremities and muscle strength and reflexes were within normal limits.  Plaintiff was diagnosed

22  with chronic back pain and stiffness and pain in her hands.  She was instructed to continue

23  Vicodin and Elavil and increase her blood pressure medications.  AR 475.

24    ALJ's Findings

25    The ALJ determined that Plaintiff had the severe impairments of lumbar degenerative

26  disc disease with small bulge and tear at L5-S1, lumbar radiculopathy and lumbar facet

27  arthropathy.  AR 21.  Despite these impairments, the ALJ found that Plaintiff retained the

28  residual functional capacity ("RFC") to perform the full range of medium work.  With this RFC,

14

1   Plaintiff could perform her past relevant work as an in-home support care provider.

2   Alternatively, Plaintiff could perform a significant number of jobs in the national economy.  AR

3   23.

4                                    **SCOPE OF REVIEW**

5         Congress has provided a limited scope of judicial review of the Commissioner's decision

6   to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

7   the Court must determine whether the decision of the Commissioner is supported by substantial

8   evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla,"

9   *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

10  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

11  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

12  401.  The record as a whole must be considered, weighing both the evidence that supports and

13  the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

14  995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

15  apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

16  This Court must uphold the Commissioner's determination that the claimant is not disabled if the

17  Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

18  substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

19  Cir. 1987).

20                                        **REVIEW**

21        In order to qualify for benefits, a claimant must establish that he is unable to engage in

22  substantial gainful activity due to a medically determinable physical or mental impairment which

23  has lasted or can be expected to last for a continuous period of not less than 12 months.  42

24  U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

25  such severity that he is not only unable to do her previous work, but cannot, considering his age,

26  education, and work experience, engage in any other kind of substantial gainful work which

27  exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

28

1  The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th
2  Cir. 1990).

3          In an effort to achieve uniformity of decisions, the Commissioner has promulgated
4  regulations which contain, inter alia, a five-step sequential disability evaluation process. 20
5  C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f).  Applying this process in this case, the ALJ found
6  that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of her
7  disability; (2) has an impairment or a combination of impairments that is considered "severe"
8  (lumbar degenerative disc disease with small bulge and tear at L5-S1, lumbar radiculopathy and
9  lumbar facet arthropathy) based on the requirements in the Regulations (20 CFR §§ 416.920(b));
10  (3) does not have an impairment or combination of impairments which meets or equals one of the
11  impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) can perform her past
12  relevant work; or alternatively, (5) could perform a significant number of jobs in the national
13  economy.  AR 21-23.

14          Here, Plaintiff argues that the ALJ (1) improperly analyzed the medical opinions; (2)
15  improperly rejected her allegations; and (3) improperly rejected the testimony of Alysia Bonner.

16                                          **DISCUSSION**

17  A.      Analysis of Opinion Evidence

18          Plaintiff argues that the ALJ improperly rejected the opinion of five physicians, four of
19  whom rendered their opinions years before Plaintiff's alleged onset date.

20          Cases in this circuit distinguish among the opinions of three types of physicians: (1) those
21  who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant
22  (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining
23  physicians).  As a general rule, more weight should be given to the opinion of a treating source
24  than to the opinion of doctors who do not treat the claimant. *Orn v. Astrue*, 495 F.3d 625, 631
25  (9th Cir.2007); *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987).  At least where the treating
26  doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and
27  convincing" reasons.  *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir.1991).  Even if the
28  treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this

opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983).

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506. And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician. *Pitzer*, 908 F.2d at 506 n. 4; *Gallant*, 753 F.2d at 1456. In some cases, however, the ALJ can reject the opinion of a treating or examining physician, based in part on the testimony of a nonexamining medical advisor. *E.g., Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir.1989); *Andrews*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir.1995). For example, in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a treating physician, "the ALJ did not rely on [the nonexamining physician's] testimony alone to reject the opinions of Magallanes's treating physicians...." *Magallanes*, 881 F.2d at 752 (emphasis in original). Rather, there was an abundance of evidence that supported the ALJ's decision: the ALJ also relied on laboratory test results, on contrary reports from examining physicians, and on testimony from the claimant that conflicted with her treating physician's opinion. *Id*. at 751-52.

### Drs. Escobar, Peery, Frainie and Nugent

Dr. Escobar and Dr. Peery were State Agency physicians who determined that Plaintiff retained a light RFC in 1999 and 2000, respectively. AR 300, 340. Dr. Frainie performed a consultive examination in 1999 and opined that Plaintiff was limited to light work. AR 294. Dr. Nugent, who treated Plaintiff from November 1998 to April 2000, opined during that time period that Plaintiff could perform less than medium work. AR 254-293, 311-314.

The ALJ acknowledged these opinions but found that more recent opinion evidence contradicted a light RFC. AR 12. Indeed, these opinions were offered in 1999 and 2000, at least three years *prior* to Plaintiff's alleged onset date of June 2003. Though Plaintiff attempts to characterize the rejection as based solely on contradictory evidence, the fact that the contradictory evidence was directly related to the time at issue is of significant consequence. *Johnson v. Shalala*, 60 F.3d 1428, 1432-1433 (9th Cir. 1995); *Burkhart v. Bowen*, 856 F.2d 1335, 1340 n. 1 (9th Cir.1988). "Medical opinions that predate the alleged onset of disability are of limited relevance." *Carmickle v. Comm'r Soc. Sec.*, 533 F.3d 1155, 1165 (9th Cir. 2008).[2]

The ALJ also specifically notes that the more recent opinions of consultive examiners Dr. Smith and Dr. Damania, who both found Plaintiff capable of restricted medium work, contradicted the 1999 and 2000 opinions. AR 22. Dr. Smith performed his examination in June 2002, and although still one year prior to the alleged onset date, it was more recent in time than the older opinions. Similarly, Dr. Damania examined Plaintiff in September 2005. AR 22. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (consultive examiner's opinion may constitute substantial evidence because it is based on examiner's independent findings and observations).

*Dr. Nijjar*

The ALJ also recognized Dr. Nijjar, who opined in February 2004 that Plaintiff could perform less than light work. AR 22. The ALJ rejects this opinion, however, because it is not consistent with the weight of the evidence, i.e., the opinions of Dr. Smith, Dr. Damania and Dr. Martinson. AR 22. Plaintiff argues that the ALJ cannot reject the opinion solely because it conflicts with other opinions. Plaintiff asserts, "this is nothing more than a recognition that there is a conflict between and among opinions" and therefore does not qualify as a specific and legitimate reason. Opening Brief, at 13.

---

[2] Plaintiff suggests in her reply that a finding that the ALJ rejected the 1999 and 2000 opinions as remote is a post hoc rationalization. Given the ALJ's use of the terms "older (pre-current application) assessments" and "more recent," Plaintiff's argument is baseless.

1    While the Court agrees that it may be insufficient to simply to adopt one examining

2    source over another because the two opinions conflict, the ALJ did not do so here.  Rather, Dr.

3    Nijjar's opinion was the most restrictive of all the medical opinions and was contradicted by a

4    *majority* of the medical evidence.

5    *Dr. Martinson*

6    The ALJ adopted the opinion of Dr. Martinson, an Agreed Medical Examiner who

7    determined that Plaintiff was precluded from heavy work.  AR 22.  Plaintiff disagrees with this

8    decision because she contends that Dr. Martinson's opinion was not supported.  Plaintiff first

9    faults Dr. Martinson for being unaware of the September 16, 2003, EMG study conducted by Dr.

10   Cyrulnik.  Plaintiff's argument is curious, however, because although Dr. Nijjar was aware of the

11   EMG study, he stated that the study was "basically useless."  AR 383.  In any event, Dr.

12   Martinson reviewed Dr. Nijjar's report and was therefore aware of the EMG study.  AR 373.

13   Plaintiff also contends that it is unclear whether Dr. Martinson agreed with Dr. Nijjar's

14   entire opinion or just his finding that Plaintiff is permanent and stationary.  Dr. Martinson states,

15   "Dr. Nijjar performed a QME evaluation on her on February 17, 2004, and found her to be

16   permanent and stationary at that time.  I certainly concur with his opinion."  AR 375.  The

17   statement itself is clear that she concurs only with the permanent and stationary aspect of Dr.

18   Nijjar's opinion.  Indeed, the statement appears three paragraphs above the section specifically

19   entitled, "Work Status," and where Dr. Martinson unequivocally states that Plaintiff is only

20   precluded from heavy work.  AR 375.  Plaintiff's argument is without merit.

21   Finally, Plaintiff argues, for the first time in her Reply, that the ALJ erred in relying on

22   Dr. Martinson's opinion because it was set forth in workers' compensation terminology.[3]  She

23   first contends that Dr. Martinson's status as an Agreed Medical Examiner does not bolster her

24   opinion.  In adopting her opinion, the ALJ notes that Dr. Martinson was "agreed upon by the

25   claimant."  AR 22.  Plaintiff contends that although she agreed to have Dr. Martinson examine

26

27         [3] Plaintiff did not raise this issue in her Opening Brief.  In her Reply, she attempts to couch the argument as
     a reply to Defendant's opposition even though the issue was specifically raised by the ALJ and should have been
28   discussed in the Opening Brief.  The Court generally does not address issues raised for the first time in a Reply, but
     out of an abundance of caution, it will review this issue.

1   her, she did not agree to accept her opinions.  The ALJ is not suggesting, however, that Plaintiff

2   agreed to accept Dr. Martinson's opinion and that he adopts it for this reason.  It is clear from the

3   ALJ's discussion that he accepted Dr. Martinson's opinion because it was consistent with the

4   evidence.  AR 22.

5          Plaintiff next contends that the ALJ erred in accepting Dr. Martinson's findings because

6   the findings addressed only Plaintiff's workers' compensation injury under workers'

7   compensation rules.  Citing *Desrosiers v. Sec'y of Health and Human Serv.*, 846 F.2d 573, 576

8   (9th Cir. 1988), Plaintiff contends that because Dr. Martinson was not required to go beyond

9   finding Plaintiff incapable of heavy work, i.e., she was not required to make strength and postural

10  findings, her opinion is incomplete.

11         Plaintiff correctly notes that the categories of work under the Social Security disability

12  scheme and workers' compensation scheme are "measured quite differently."  *Desrosiers v.*

13  *Sec'y of Health and Human Serv.*, 846 F.2d 573, 576 (9th Cir. 1988).  "They are differentiated

14  primarily by step increases in lifting capacities."  *Id.*  However, "[a]lthough [workers'

15  compensation status is] not conclusive in a social security case, the ALJ is entitled to draw

16  inferences logically flowing from the evidence."  *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir.

17  1996) (citing *Desrosiers,* 846 F.2d at 576).

18         Here, unlike *Desrosiers*, the ALJ did not make an affirmative mistake in translating

19  terms.  In *Desrosiers*, the ALJ erred when he failed to acknowledge the distinction and

20  incorrectly concluded that "heavy lifting is considered to be above fifty pounds." *Desrosiers,* 846

21  F.2d 576.  There is no indication here that the ALJ failed to recognize that a distinction exists

22  between the workers' compensation scheme and the Social Security scheme.  Instead, he adopted

23  her opinion that Plaintiff could not perform heavy work, an opinion which was consistent with

24  numerous medical opinions finding that Plaintiff could perform medium work.  The Court also

25  notes that Dr. Martinson did, to some extent, explain Plaintiff's strength limitations when she

26  found that Plaintiff could not perform her past work as a home care aide because she could not

27  lift patients during transfers.  AR 375-376.

28

1  Insofar as Plaintiff argues that the ALJ failed to adopt Dr. Martinson's finding that

2  Plaintiff could not perform her past work as a home care aide, her argument fails.  The ALJ need

3  not believe everything a physician sets forth, and may accept all, some, or none of the physician's

4  opinions. *Magallanes v. Bowen* 881 F.2d 747, 753-745 (9th Cir. 1989).  In any event, the ALJ

5  made an alternate step five finding based on the VE's testimony.

6  Finally, to the extent Plaintiff faults the ALJ for failing to discuss the additional

7  limitations set forth by Dr. Damania and Dr. Smith, any error is harmless.  The ALJ set forth the

8  full opinions of both doctors in two separate hypothetical questions posed to the VE.  In response

9  to each, the VE indicated that Plaintiff could perform medium, unskilled work.  AR 539-541,

10  542-543.  *Batson v. Comm'r Soc. Sec.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (finding an error

11  harmless where it did not negate the validity of the ALJ's ultimate conclusion).

12  The ALJ's analysis of the medical evidence was therefore based on substantial evidence

13  and free of legal error.

14  B.  Plaintiff's Subjective Complaints

15  Plaintiff next argues that the ALJ erred in rejecting her allegations.

16  In *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), the Ninth Circuit summarized the

17  pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's

18  subjective complaints:

19  An ALJ is not "required to believe every allegation of disabling pain" or other
   non-exertional impairment.  *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989).
20  However, to discredit a claimant's testimony when a medical impairment has been
   established, the ALJ must provide "'specific, cogent reasons for the disbelief.'" *Morgan*,
21  169 F.3d at 599 (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why
   the [claimant's] testimony is unpersuasive." *Id.*  Where, as here, the ALJ did not find
22  "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the
   claimant's testimony must be clear and convincing." *Id.*

23
24  Social Security Administration rulings specify the proper bases for rejection of a
   claimant's testimony. . . An ALJ's decision to reject a claimant's testimony cannot be
24  supported by reasons that do not comport with the agency's rules.  *See* 67 Fed.Reg. at
25  57860 ("Although Social Security Rulings do not have the same force and effect as the
   statute or regulations, they are binding on all components of the Social Security
26  Administration, ... and are to be relied upon as precedents in adjudicating cases."); *see
   Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at
27  step three of the disability determination was contrary to agency regulations and rulings
   and therefore warranted remand).  Factors that an ALJ may consider in weighing a
28  claimant's credibility include reputation for truthfulness, inconsistencies in testimony or

1    between testimony and conduct, daily activities, and "unexplained, or inadequately

2    explained, failure to seek treatment or follow a prescribed course of treatment."  *Fair,*
885 F.2d at 603; *see also Thomas,* 278 F.3d at 958-59.

3        Here, the ALJ began his credibility analysis by explaining that Plaintiff has "a dismal

4    work history with only 2-1/2 years full substantial gainful activity years in the past relevant 15."

5    AR 22.  *Thomas v. Barnhart,* 278 F.3d 947, 958-959 (9th Cir. 2002) (ALJ properly relied on the

6    fact that the claimant had an "extremely poor work history" and "has shown little propensity to

7    work in her lifetime.").  Plaintiff does not dispute the ALJ's ability to examine work history, but

8    contends that the ALJ should have sought an explanation.  The Court agrees that an ALJ should

9    generally inquire into why a claimant has not worked before holding a poor work history against

10    her.  Here, however, Plaintiff was represented by counsel at the hearing and could have submitted

11    an explanation at the hearing.  Plaintiff also does not set forth any explanation in her briefings

12    before this Court.

13        The ALJ next cites Plaintiff's daily activities, finding that she does a "fairly wide range"

14    of activities not consistent with her claim of disability.  AR 22.  The ALJ notes that Plaintiff

15    babysits her three grandchildren 10 hours a day, does dishes once a day, talks on the phone twice

16    a day, goes shopping for personal needs once a month, visits with others outside the home once a

17    day, cleans the kitchen once a day, irons once a week, reads the Bible once a day and watches

18    television two hours a day.  AR 22.

19        Plaintiff argues that the ALJ misrepresents her testimony and argues that she does not

20    babysit her grandchildren for 10 hours a day.  The Court agrees that Plaintiff's testimony that she

21    is "home alone" with her grandchildren for 10 hours a day does not mean that she is babysitting

22    them for 10 hours a day, especially when her grandchildren are 17, 15 and 8.

23        Plaintiff also contends that the remaining activities cited are intermittent, sedentary

24    activities that do not contradict her testimony.  During one day, however, Plaintiff testified that

25    she does dishes once, talks on the phone twice, visits with others outside her home once, cleans

26    the kitchen once, reads the Bible once and watches television for two hours.  While some of

27    these activities may be sedentary, it was reasonable for the ALJ to find her activities inconsistent

28    with her allegations that she has constant pain in her back and left leg which she rates at a 7 out

1   of 10, needs to lay down for two hours during the day, has hand cramps for three hours of the day

2   and is taking medication that makes her suicidal and more depressed.  AR 526, 531, 546-547,

3   548.  *See eg.*, *Valentine v. Comm'r Soc. Secy.*, 574 F.3d 685, 693 (9th Cir. 2009) ("The ALJ

4   recognized that this evidence did not suggest Valentine could return to his old job at Cummins,

5   but she thought it did suggest that Valentine's later claims about the severity of his limitations

6   were exaggerated.").

7        Even though the ALJ incorrectly assumed that Plaintiff babysat her grandchildren for 10

8   hours a day, the error is harmless where the remaining factors are proper.  *Batson v. Barnhart,*

9   *359 F.3d 1190, 1197 (9th Cir.2004)* (upholding ALJ's credibility determination even though one

10   reason may have been in error).

11        The ALJ also notes his observations during the hearing.  For example, although Plaintiff

12   testified that she could sit for only 20 to 25 minutes, she sat for 55 minutes at the hearing even

13   though she was told at the outset that she could get up if she needed to.  AR 22.  He also noted

14   that Plaintiff testified that she could only concentrate for 15 minutes maximum, yet paid attention

15   and responded appropriately throughout the 65 minute hearing.  AR 22.  See *Morgan v. Comm'r,*

16   *169 F.3d 595, 599 (9th Cir. 1999)* ("inclusion of the ALJ's personal observations does not render

17   the decision improper" when they are supported and other evidence is cited); *Drouin v. Sullivan,*

18   *966 F.2d 1255, 1258-59 (9th Cir. 1992)* (ALJ's observations during the hearing, along with other

19   evidence, constitutes substantial evidence).

20        The ALJ next set forth inconsistencies in Plaintiff's testimony.  For example, although

21   Plaintiff testified that she was fully compliant with treatment, she admitted that she still smokes

22   cigarettes and does not exercise.  AR 22.  Plaintiff argues that "[s]moking cigarettes is not an

23   activity that reflects upon [her] allegations of pain."  Opening Brief, 20.  Certainly, the ALJ was

24   not suggesting that Plaintiff's ability to smoke shows that she is not in as much pain as she

25   contends.  Rather, the ALJ was appropriately evaluating Plaintiff's overall compliance with

26   treatment to assess whether her impairments are as serious as she alleges.  *Bruton v. Massanari,*

27   *268 F.3d 824, 828 (9th Cir. 2001)* (claimant's failure to seek or follow prescribed treatment is a

28

proper basis for finding her allegations of disabling pain and other symptoms not credible);

*Osenbrock v. Apfel*, 240 F.3d 1157, 1167 (9th Cir. 2001).

As to the ALJ's citation to Plaintiff's depression, she argues that the ALJ cannot reject her testimony based on her failure to seek treatment.  AR 22.  Plaintiff is correct that it is questionable for an ALJ to discredit a claimant for failure to seek mental health treatment, yet it does not appear that he cited her depression as a reason for discrediting her testimony.  He states that Plaintiff "also alleged recent depression, but stated she has not gone to a psychiatrist *yet*," and based on this, he found her that her depression was not severe.  AR 23.  It therefore appears to be more of a step two finding despite its proximity to the credibility analysis.  Additionally, the ALJ uses the phrase "yet," which suggests that he accepts her testimony that she had an appointment with a psychiatrist just a few days after the hearing.  AR 548-549.

Finally, the ALJ cites the lack of evidence supporting Plaintiff's allegations regarding her manipulative limitations and vision problems.  The discussion about her vision appears to also be partly related to a step two severity finding, though he also specifically states that although Plaintiff alleged vision problems, she has never seen an eye doctor and wears reading glasses purchased from the drug store.  AR 23.  Similarly, although Plaintiff complained of manipulative limitations, such severe limitations were not supported by the medical record.  AR 23.  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996) (ALJ may discredit a claimant's based on lack of evidence so long as it is not the sole reason for the rejection).

For the reasons set forth above, the Court determines that the ALJ did not arbitrarily reject Plaintiff's testimony.  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).  The analysis is supported by substantial evidence and is free of legal error.

C.     Lay Witness Testimony

Finally, Plaintiff faults the ALJ for not addressing the testimony of Alysia Bonner.  Other than stating that Ms. Bonner's testimony "corroborates" her testimony, she does not specifically identify any of Ms. Bonner's testimony or explain how it would have been of benefit.

"In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work."  *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th

24

Cir. 2009) (citing *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir.2006)).  Such testimony is

competent evidence and "cannot be disregarded without comment."  *Id.* (citing *Nguyen v. Chater*,

100 F.3d 1462, 1467 (9th Cir.1996)).  If an ALJ disregards the testimony of a lay witness, the

ALJ must provide reasons "that are germane to each witness."  *Id.*  Further, the reasons "germane

to each witness" must be specific.  *Stout*, 454 F.3d at 1054 (explaining that "the ALJ, not the

district court, is required to provide specific reasons for rejecting lay testimony").

      The ALJ, however, need not discuss all evidence presented.  See *Vincent on Behalf of*

*Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir.1984).  Rather, he must explain why

"significant probative evidence has been rejected."  *Id.* (citing *Cotter v. Harris*, 642 F.2d 700,

706 (3d Cir.1981)).  Lay witness testimony which is neither significant nor probative may be

properly ignored.  *See id.* at 1395.  Similarly, third party testimony which is unsupported or

controverted by medical evidence may be rejected. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218

(9th Cir.2005).

      Here, Alysia Bonner submitted a Third Party Daily Activities Questionnaire dated March

27, 2002.  Ms. Bonner does not set forth her relationship with Plaintiff, but states that Plaintiff

lives with her.  Ms. Bonner helped Plaintiff prepare meals twice a week and did her shopping.

Ms. Bonner states that Plaintiff was in pain often and was upset that she couldn't do the things

she used to.  Plaintiff did not sleep, needed help with grooming and did not like to go outside or

see people.  AR 162-167.

      Ms. Bonner's questionnaire is dated March 27, 2002, almost 15 months *before* June 2003,

when Plaintiff stated that she stopped working and became disabled.  In other words, Ms.

Bonner's statements were from a period in time when Plaintiff was working and not alleging

disability.  Her statements are also inconsistent with Plaintiff's own testimony that prepares

simple meals once a day, takes care of her own personal needs, talks on the phone twice a day

and visits with other people outside her home once a day.  AR 521-525.  Ms. Bonner's

statements were therefore not probative and the ALJ did not err in failing to discuss them.

      The ALJ's treatment of the lay witness testimony was supported by substantial evidence

and was free of legal error.

1

2                                    **RECOMMENDATION**

3          Based on the foregoing, the Court finds that the ALJ's decision is supported by

4   substantial evidence and based on proper legal standards.  Accordingly, the Court

5   RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of

6   Social Security be DENIED and that JUDGMENT be entered for Defendant Michael J. Astrue

7   and against Plaintiff Glenda Brown.

8          This Findings and Recommendation will be submitted to the Honorable Lawrence J.

9   O'Neill pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within thirty (30) days after

10  being served with this Findings and Recommendation, the parties may file written objections

11  with the court.  The document should be captioned "Objections to Magistrate Judge's Findings

12  and Recommendation."  The parties are advised that failure to file objections within the specified

13  time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153

14  (9th Cir. 1991).

15

16         IT IS SO ORDERED.

17      **Dated:   July 5, 2011            /s/ Dennis L. Beck**
                                            UNITED STATES MAGISTRATE JUDGE
18

19

20

21

22

23

24

25

26

27

28